IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | Case No. 8:04CR204 |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | **MEMORANDUM AND ORDER** |
| | ) | **(With Tentative Findings)** |
| GARY DEAN GOCHENOUR, | ) | |
| | ) | |
| Defendant. | ) | |

   This case involves an incompetent robber.  Using a toy gun, the defendant stuck up a restaurant and several banks over three days in the summer of 2001 to fuel his crack habit.  He did not hurt or traumatize anyone.  He got away with less than $2,700.  On a scale of I to VI, he has the worst criminal history possible.  He has been in and out of drug treatment in the past.  Until recently, that treatment has failed.  Given these facts, my inclination was to "throw away the keys."  However, the defendant's excellent public defender asserted that this case was unusual, and he asked that I take a deeper look.  I did what he requested.

   I took evidence on the issues that make this case unusual on August 5, 2005.[1] I then decided that it would be appropriate to continue sentencing for about a year to see if the defendant could maintain his unusually good progress.[2]  In order to objectively gauge that progress, I also ordered a second revised presentence report. I am now in receipt of the second revised presentence investigation report (2nd PSR). It was submitted on November 1, 2006, pursuant to my earlier order.

---

   [1]Filing 57 (transcript).

   [2]Filings 59 & 62.

Among other things, the second revised presentence report[3] adjusts the base offense level upward by one level due to an earlier oversight[4] and it states that a "24 month prison sentence would be sufficient, but not greater than necessary,[5] to comply with the purposes set forth at 18 U.S.C. [§] 3553(a)(2)" even though the advisory Guidelines call for a much longer sentence.[6]  The parties have had an opportunity to brief the issues following their review of the second revised presentence report and I have carefully considered those briefs.[7]

---

[3]The original presentence report, a supplemental report on why the government's prosecution of the defendant was delayed, and the second revised presentence report were all prepared by Michael R. Norton, a Supervising United States Probation Officer.  Mr. Norton is also responsible for overseeing the work of all the other presentence report writers in our district.  He is a Guidelines expert.  He is also a person of uncommon ability and judgment.  As an aside, Mr. Norton is not noted for being a "bleeding heart," and neither am I.  See, e.g., The Philip D. Reed Lecture Series Panel Discussion, Federal Sentencing Under "Advisory" Guidelines: Observations by District Judges, 75 Fordham L. Rev. 1 (2006) (Hon. Lynn S. Adelman, Judge, Eastern District of Wisconsin; Hon. Nancy Gertner, Judge, District of Massachusetts; Hon. Richard G. Kopf, Judge, District of Nebraska; Hon. Gerard E. Lynch, Judge, Southern District of New York; Hon. Gregory A. Presnell, Judge, Middle District of Florida; and Moderator, Daniel J. Capra, Philip D. Reed Professor of Law, discussing the proper approach to sentencing under advisory Guidelines).

[4]2nd PSR ¶¶ 37, 41, 51, 54, 56, 58 (value of stolen vehicle).

[5]As I have written elsewhere, I am not a fan of using the "parsimony" provision of 18 U.S.C. § 3553 as an excuse to do something different than what is called for by the Guidelines.  Almost always, the Guidelines, without departure or variance, provide the proper sentence.  This is one of the unusual cases where that is not so, but I do not hang my hat on the "parsimony" provision.

[6]2nd PSR ¶ 133, at 28.

[7]Filings 69 & 70.

I now issue this opinion to guide the parties and me at sentencing.[8]  While my views are tentative, and the government and the defendant will be given an opportunity to convince me otherwise, I am likely to impose a 24-month prison sentence.

## I.  BACKGROUND

I first explain the proper Guidelines calculations.  Then, I describe the offense conduct and a state robbery that occurred as a part of that spree.  After that, I describe the offender up to the point of his work release from state prison on the latest charges.  Then, I describe the defendant's progress since that time.

### A.  The Proper Guidelines Calculations Before Departures

Before departure, the proper Guidelines calculations are these:

| | |
|---|---|
| Total Offense Level: | 29[9] |
| Criminal History Category: | VI[10] |
| Custodial Range: | 151-188 months[11] |
| Supervised Release Range: | 2-3 years[12] |
| Fine Range: | $15,000-$150,000[13] |

---

[8]I take judicial notice for the purposes of evidence of the facts stated in the 2nd PSR.

[9]2nd PSR ¶ 61.

[10]2nd PSR ¶ 74.  The defendant has a total of 16 criminal history points.  Nine of those points came from two "burglaries."  More about those crimes later.

[11]2nd PSR ¶ 107.

[12]2nd PSR ¶ 111.

[13]2nd PSR ¶ 116.

-3-

Restitution:                     $1,935.49[14]

## B.  The Bank and Restaurant Robberies

The events that give rise to this case and a related state case took place between June 14, 2001, and June 17, 2001, in the Omaha, Nebraska, area.  During this time, Gary Dean Gochenour (Gochenour) obtained a toy gun[15] and then proceeded to rob or attempt to rob three financial institutions and a restaurant.

On the morning of June 14, 2001, Gochenour robbed the Metro Health Services Credit Union and displayed the ersatz gun as a part of that robbery.[16]  While he took $7,361, he did not get away with the money.  Rather, a "dye pack" exploded and the defendant dropped the money about 100 yards from the bank.  To accomplish this failed robbery, Gochenour stole a car worth $4,000.[17]

That afternoon, Gochenour entered the Commercial Federal Bank and robbed it of $1,935.49.[18]  Again, he displayed a "gun."

_____

[14] 2nd PSR ¶ 120.

[15] According to the government, "Gochenour passed a polygraph allowing law enforcement to believe the handgun used was likely a toy gun."  2nd PSR ¶ 15.

[16] 2nd PSR ¶ 11.  Despite the fact that the gun was a toy, the defendant received a three-level increase for use of this mock weapon.  2nd PSR ¶¶ 28, 36, 44.

[17] 2nd PSR ¶ 37.  Even though the car was later recovered undamaged and Gochenour dropped the $7,361 he stole, and that money was recovered within yards of the bank, Gochenour's base offense level was increased by one because the intended loss (the money plus the car) exceeded $10,000.

[18] 2nd PSR ¶¶ 12, 17.  This sum is the total restitution that the defendant owes in this case.

Two days later, and on June 16, 2001, the defendant tried to rob the Mid City Bank.[19]  He claimed to have a gun.  However, a bank officer snatched the bag away from a teller as she was about to hand the bag with the money over to Gochenour. The officer ordered the defendant to leave the bank; Gochenour complied and ran away.

Perhaps because bank robberies were too stressful, what with exploding dye packs and bank officers who were not the least bit intimidated by a toy gun, the defendant turned to easier pickings.  On June 17, 2001, the defendant entered the IHOP restaurant in Omaha, Nebraska, revealed a "gun," and robbed that fine eatery of $660.[20]

The spree quickly came to an end on June 22, 2001, when the defendant was arrested by the Omaha Police Department for the IHOP restaurant robbery.[21] Gochenour was implicated in the robbery through video surveillance and photo lineups.  Gochenour was convicted of the IHOP robbery and was sentenced to 3-5 years in prison on October 16, 2001.

Almost immediately, the federal government became aware of Gochenour's arrest.[22]  The government quickly tied him to the robberies which form the charges in this case.  Despite this knowledge, the government waited until he was released from state prison in 2004 to indict him.  By then, and as we shall see, Gochenour's life had begun to change.

---

[19]2nd PSR ¶¶ 13-14.

[20]2nd PSR ¶ 69.  I must confess that I have an unnatural affection for IHOP pancakes.

[21]2nd PSR ¶¶ 15, 69.

[22]Court's Exhibit 1.

The total actual loss to victims of the four robberies was minimal. The car Gochenour stole was recovered undamaged and he made away with less than $2,700 in cash.[23] Specifically, the Commercial Federal Bank lost $1,935.49 and the IHOP restaurant lost $660. As established by the probation officer's investigation, there is no information that anyone was injured or traumatized during any of these robberies.[24]

### C. Before Work Release in 2003

Gochenour was born on August 10, 1967.[25] Until the defendant's late twenties, his life was, according to his brother, "very normal."[26] He reported a close relationship with his parents.[27] He loved music, learning to play the drums at nine years of age.[28] Unlike the defendant, his siblings have always been productive members of society.[29]

Although psychological testing not surprisingly reveals that he can be impulsive, Gochenour is smart.[30] He has an IQ of 115. At the Metropolitan Community College, were he studied such things as print reading and sketching,

---

[23] 2nd PSR ¶¶ 18-20, 69.

[24] 2nd PSR ¶¶ 18-20, 69.

[25] 2nd PSR at 2. He is now 39 years of age.

[26] Filing 57, at 20.

[27] 2nd PSR ¶ 83.

[28] 2nd PSR ¶ 88.

[29] 2nd PSR ¶ 83.

[30] 2nd PSR ¶ 91.

principles of management, microcomputer fundamentals, computer keyboarding, and floor covering, his grade point average was 4.0.[31]

With the exception of a 1984 juvenile conviction, when he was 16, for possession of less than an ounce of marijuana and possessing liquor in a park, Gochenour had no criminal history until 1995 when he was 27 years of age.[32]  He quickly made up for lost time.  Within the space of six years, and between 1995 and 2001, Gochenour collected 16 criminal points.[33]  During that time, he served three stints in Nebraska prisons.

What happened  to Gochenour?  Why did he follow a law-abiding path until his late twenties, and then so quickly become a "career" criminal?

Clay Gochenour testified and told me about his brother.[34]  He explained that in 1992 the boys' mother died after suffering from an agonizing series of heart attacks.  Tragically, and apparently without warning, "the stress of it all took my father two days later."[35]  At that point, "we watched Gary just go on a downhill spiral emotionally.  He didn't know how to deal with it."[36]

---

[31]2nd PSR ¶ 97.

[32]2nd PSR ¶¶ 64-65.

[33]2nd PSR ¶ 74.

[34]Filing 57, at 21-22.  I found Clay to be unusually credible.  Clay would not tolerate his brother's drug abuse.  In fact, he turned his brother in to the police.  2nd PSR ¶ 75.

[35]Filing 57, at 21.

[36]Filing 57, at 21.

The defendant turned to crack cocaine, and quickly became addicted.  He soon had a daily habit of $50 to $200.[37]  He voluntarily sought inpatient drug treatment in 1994.  While he successfully completed the 28-day program, he began abusing crack again within a few days of his discharge.[38]

Between 1994 and his last incarceration, which began in June of 2001, Gochenour's life was tumultuous.  He became engaged to be married, and fathered a child, but his fiancee broke off the relationship in 1998 because of the defendant's drug abuse.[39]

His family and friends tried to help.  For example, Clay gave his brother a place to live, but later threw him out and called the police when Clay found his brother's stash of crack cocaine.[40]  Despite these kindnesses, the defendant stole from his brother,[41] the defendant's grandmother,[42] and the defendant's friends[43] in order to pawn the stolen items to feed his all-consuming crack habit.

On August 2, 1995, Gochenour's descent into law-breaking began with an attempted burglary of a lounge.[44]  Gochenour stole a guitar and pawned it an hour

---

[37] 2nd PSR ¶ 75.

[38] 2nd PSR ¶ 92.

[39] 2nd PSR ¶ 86.

[40] 2nd PSR ¶ 75.

[41] 2nd PSR ¶ 68.

[42] 2nd PSR ¶ 67; Filing 57, at 8.

[43] 2nd PSR ¶ 68; Filing 57, at 9.

[44] 2nd PSR ¶ 65.

later.  He was sentenced to one year of probation and ordered to pay $125 in restitution.  He failed at probation, but he was not jailed.  He admitted using crack and was discharged unsuccessfully from another inpatient chemical dependency program.

On April 23, 1996, Gochenour purloined a ring (later recovered) from a jewelry store.[45]  Gochenour explained to the police that he stole the ring because he had no place to live and "decided at the spur of the moment to do something" to find money to remedy that situation.   Seven days later, and on May 1, 1996, Gochenour burglarized his grandmother's home, stole a television, and pawned it for $120 to buy crack.[46]  His grandmother was in the hospital at the time of the burglary.  On January 13, 1997, he was sentenced to prison for both of these crimes.  He received a sentence of 2-5 years on each charge to be served concurrently.  He was paroled on April 28, 1998, but his parole was revoked three months later, on July 28, 1998.

On July 1, 1998, Gochenour stole a guitar, an amplifier, and various power tools from his brother, Clay.[47]  On July 2, 1998, he broke into the home of a friend and stole two keyboards and an amplifier.  When caught for these crimes, the defendant admitted that he had pawned the stolen merchandise to buy crack cocaine. He used his own name on the pawn ticket.[48]  On December 14, 1998, he was sentenced to 3-5 years in prison for the burglary of his friend's home.  The theft charge involving his brother was dismissed.

---

[45]2nd PSR ¶ 66.

[46]2nd PSR ¶ 67.

[47]2nd PSR ¶ 68.

[48]Filing 57, at 9.

Gochenour was paroled on May 17, 2001, from his second stint in prison. But he was not done yet. About one month later, between June 14 and June 16, 2001, Gochenour committed the bank robberies for which he stands charged in this case.[49] On June 17, 2001, he robbed the IHOP restaurant and on October 16, 2001, he was sentenced to his third term in state prison.[50] He received a sentence of 3-5 years.

### D. From and After Work Release in 2003

While serving his third prison sentence, the defendant began to seriously devote himself to work, first as a dye maker and later building homes for low-income families.[51] After those experiences, Gochenour was placed in the Nebraska "work release program" on October 13, 2003.[52] The Nebraska penal authorities rated the defendant's progress while on work release as "outstanding" in all areas. He completed work release on May 3, 2004, in preparation for the mandatory discharge of his state prison sentence on May 11, 2004.

Despite the fact that the government knew the defendant had committed these federal crimes by the fall of 2001, and even though the government knew the defendant was in state custody,[53] the defendant was not indicted until April 22, 2004.[54] The defendant was arrested on these federal charges on May 11, 2004, the

---

[49]2nd PSR ¶¶ 11-13.

[50]2nd PSR ¶ 69.

[51]2nd PSR ¶ 99.

[52]2nd PSR ¶ 124.

[53]Court's Exhibit 1.

[54]2nd PSR ¶ 2.

day he was released from state prison.[55]  He was placed on federal pretrial release on May 19, 2004, and has remained under that supervision ever since.  He has had no significant problems over the last two and one-half years of fairly intense supervision.[56]

The probation officer has carefully investigated and chronicled Gochenour's progress over the last several years since his release from state prison in May of 2004.[57]  According to the probation officer, there has been a "fundamental change in attitude."[58]  After "comparing his life pre-incarceration to his life since his release one might think we were looking at two entirely different people.  A post-offense rehabilitation departure, pursuant to U.S.S.G. § 5K2.0, appears to be justified."[59]

In "bullet-point" fashion, here are the highlights of Gochenour's progress since being placed on work release:

> \*       After ten years or more of constant drug abuse, including two failed attempts at in-patient drug treatment, according to the probation officer, "[Gochenour] has [seemingly] overcome a serious addiction to crack cocaine.  Almost all of his criminal

---

[55]2nd PSR at 1.

[56]2nd PSR ¶¶ 5-7.

[57]2nd PSR ¶¶ 122-133.

[58]2nd PSR ¶ 132.

[59]2nd PSR ¶ 132.  The probation office carefully studied and discussed many of the cases from the Eighth Circuit relative to "post-offense rehabilitation."  Those cases include United States v. Rogers, 400 F.3d 640 (8th Cir. 2005), cert. denied, 126 S. Ct. 1020 (2006); United States v. Willey, 350 F.3d 736 (8th Cir. 2003); United States v. Patterson, 315 F.3d 1044 (8th Cir. 2003); United States v. DeShon, 183 F.3d 888 (8th Cir. 1999); and United States v. Kapitzke, 130 F.3d 820 (8th Cir. 1997).

history was created as a result of his addiction to crack. Surprisingly, he has been able to maintain sobriety upon his discharge from state prison without any formal treatment or long-term support system such as a sponsor and N/A or A/A attendance. With the exception of minor traffic violations for speeding and improper turn, he has maintained a law-abiding lifestyle."[60]

* Since October 13, 2003, when he started in the Nebraska work release program, Gochenour has labored for Valvoline Instant Oil Change at the company's Lincoln, Nebraska, office.[61] He started as a technician, then became an assistant manager, and, most recently, became manager of the store. Gochenour also assists in the management of another Valvoline store in Beatrice, Nebraska. Gochenour supervises four other employees and works between 54 to 57 hours a week. He makes $34,000.

* Monte Haeffner, the president and owner of Valvoline Instant Oil Change, appeared at the evidentiary hearing and spoke glowingly of Gochenour ability, diligence, and honesty in the work place.[62] Haeffner has experienced dealing with convicts because his company offers jobs to prisoners on work release. Comparing Gochenour to other prisoners he has hired, Haeffner testified that the defendant was different because he "gets it" and because the

---

[60]2nd PSR ¶ 131.

[61]2nd PSR ¶ 98.

[62]Filing 57, at 23-34. Mr. Haeffner has a variety of significant business interests. Id. at 24-25. He told me that he was "old, but . . . not stupid." Id. at 31. I found him to be a tough-minded businessman who was quite believable.

defendant offers no "excuses for his behavior in the past."[63] Haeffner told me that "I understand the judicial system expects to punish people and work as a deterrent . . . but I think [the Nebraska work release program] got some success here . . . ."[64] According to Haeffner, it would be a "horrendous waste" to put Gochenour back in prison.[65]

\*      Gochenour has come into frequent contact with Michael Nicholson, the service center manager at the Beatrice location of Valvoline Instant Oil Change.   Nicholson testified at the evidentiary hearing.[66]  Prior to working at Valvoline, Nicholson had been a police officer for about seven years.  He was injured taking a subject into custody, and began to work at Valvoline as a result.  Because of his law enforcement background, Nicholson believed that "once a convict, you're always going to be a convict, there's going to be no changing . . . ."[67]  But despite being "very hesitant and skeptical about how long he would last[,]" Gochenour "proved me wrong."[68]   According to Nicholson, Gochenour is "an example of what [prison] was originally designed to do, rehabilitate [a prisoner] to where [he is]

---

[63]Filing 57, at 28-29.

[64]Filing 57, at 31.

[65]Filing 57, at 31.

[66]Filing 57, at 12-18.

[67]Filing 57, at 14.

[68]Filing 57, at 14.

-13-

a productive member of society, and Gary has achieved that now."[69]

* As I noted earlier, Gochenour's brother, Clay, turned him in to the police when he found the defendant's drug stash. But, as also noted earlier, Clay has always tried to help his brother despite the fact that his brother stole from him. Clay Gochenour is thus an important and credible source of information. Clay appeared at the evidentiary hearing and testified in support of his brother.[70] Clay, who is five years older, testified that since the defendant's work release in 2003, "he's matured, he's grown up . . . he understands his place in life and . . . what he's supposed to do with the rest of his life, raise his daughter, [and] return to us as a family . . . ."[71]

* Gochenour is now dating a woman that he first met when the two were children.[72] She is an Omaha, Nebraska, radio personality. The probation officer interviewed her, and she described the defendant as "amazing" and an "inspiration" based on his overcoming the obstacles of his past. She states that she has never seen him use alcohol or drugs.

---

[69]Filing 57, at 15.

[70]Filing 57, at 19-22.

[71]Filing 57, at 22.

[72]2nd PSR ¶ 87.

-14-

\*      Although the defendant and his former fiancee no longer have a relationship (and that has engendered some bitterness on her part and on the part of the defendant's daughter), she told the probation officer that Gochenour has made "significant changes in his life," that he is a "decent guy," that she is "proud of him," and that he is voluntarily making $200-per-month child support payments even though no child support has been ordered.[73]

\*      While not testifying, numerous people wrote letters of support attesting to Gochenour's changed attitude.[74]  Two of those letters are particularly instructive.  Tim Miklas, one of the friends that Gochenour victimized in a burglary,[75] recounted that the defendant has "changed himself back into [a] person of good character, with help from the legal system, family and friends."[76]  Another friend, who has known Gochenour since they were 15 years old, wrote that the "Gary that was caught up in the land of drugs, illegal activities, is no more.  I know him as well or better than anyone, he is completely clean, away from drugs."[77]

\*      Even though Gochenour works long hours, and is cash-strapped, he has made significant efforts to assist others who are less fortunate.  Gochenour has returned to playing music with a band.

---

[73]2nd PSR ¶ 86.  She also testified at the evidentiary hearing and spoke highly of Gochenour.  Filing 57, at 35-39.

[74]Exhibits 106, 111-114.

[75]2nd PSR ¶ 68.

[76]Exhibit 106.

[77]Exhibit 112.

-15-

He and his band mates coordinated a benefit concert for military families in January of 2005, and in February of 2006 they contributed two musical selections to a compact disc that was given, without compensation, to the American Cancer Society.[78] The Director of Development for the American Cancer Society in Nebraska confirms that the Society has in turn sold copies of the disc to the public thereby raising over $10,000.[79]

\*     As one might imagine, Gochenour's progress has not been without bumps.  While he is frequently drug-tested, has never failed a drug test, and pays $35 a month to partially pay for the cost of that testing,[80] he has missed three tests during the years he has been under federal pretrial release.[81]  That said, the urine samples that he gave soon after missing these tests were negative. His employer verified that one of the missing tests was probably a result of the demands of work since the company was "swamped" after having lost two employees during this period of time.  Gochenour was also cautioned by his pretrial service officer when she observed a photo of Gochenour's band in close proximity to beer.[82]  Gochenour has also received several tickets for minor traffic violations.[83]  Still further, while Gochenour was

---

[78] 2nd PSR ¶ 89.

[79] 2nd PSR ¶ 89.

[80] 2nd PSR ¶ 103, at 23.

[81] 2nd PSR ¶ 6.

[82] 2nd PSR ¶ 7.

[83] 2nd PSR ¶ 5.

-16-

active in NA until later in 2005, his sponsor "fell off the wagon" and since then Gochenour has only attended occasional NA meetings.[84]  In addition, suffering from job stress, a deteriorating relationship with his child and the child's mother, and the stress of the impending sentence in this case, Gochenour referred himself to family counseling in June of 2006.[85]  As of November 1, 2006, he has attended seven sessions.

## II.  ANALYSIS

I first explain why I believe that three departures are appropriate.  After that, I review the statutory sentencing factors.  Ultimately, I explain that a prison sentence of 24 months is proper.

### A.  Departure Due to Overstatement of Criminal History

I will likely depart from criminal history category VI to criminal history category V pursuant to U.S.S.G. § 4A1.3(b).[86]  It is also likely that I will depart

---

[84]2nd PSR ¶ 92.

[85]2nd PSR ¶¶ 93-95.  His therapist provided the probation officer with a letter and reported nothing out of the ordinary.

[86]For a recent discussion of the principles that properly inform a departure such as this where the career offender category is involved, see United States v. Feemster, 435 F.3d 881, 883 (8th Cir. 2006) (remanding for clarification of reasons for departure, but emphasizing that "the guidelines themselves have recognized that the career offender enhancement can often result in a gross overstatement of a defendant's criminal history") (citing U.S.S.G. § 4A1.3(b)(3), United States v. Greger, 339 F.3d 666, 671 (8th Cir. 2003) & United States v. Hutman, 339 F.3d 773, 775-77 (8th Cir. 2003)).

downward three levels in order to eliminate the impact of increasing the defendant's offense level from 29 to 32 as a result of the "career offender" enhancement.

The defendant committed two burglaries in 1996 and 1998. Those convictions, which generate nine criminal history points[87] and a career offender designation that increases the total offense level,[88] significantly overstate the seriousness of the offenses.

One burglary involved the defendant entering his grandmother's home with a key while she was gone and stealing a used television set that was pawned for $120.[89] Theft of property having less than $200 in value would typically garner a low-grade misdemeanor charge. The other burglary involved entering a friend's home through an open window when the defendant had reason to believe the friend was not at home.[90] These are burglaries in name only and grossly overstate the seriousness of the real offense conduct.[91]

---

[87]The defendant received six points for the two burglaries and three points for committing the instant offense while on parole for, and less than two years after being released from prison on, the second burglary. See 2nd PSR ¶¶ 67-68, 72-73.

[88]See 2nd PSR ¶¶ 59, 67-68, 72-73.

[89]Filing 57, at 8; 2nd PSR ¶ 67. He pawned the TV for crack.

[90]Filing 57, at 9. He took two keyboards and an amplifier and pawned them for money to buy crack. 2nd PSR ¶ 68.

[91]The government's able counsel orally conceded that these offenses were "not your standard burglar[ies]." Filing 57, at 56-57. Again, in its brief, the government reiterated that it "does not take much exception" to the description that these crimes were "burglaries in name only." Filing 69, at 3. Government's counsel also did not "contest[]" that there was "sufficient reason" to "drop down those levels of the career offender [designation]." Filing 57, at 57-58. Nevertheless, the government objects to any departure for overstatement of criminal history. I respectfully conclude that the government's objection lacks merit. The defendant has a very bad criminal

If this was the only departure, the Guidelines range for purposes of imprisonment would be 110 to 137 months. After reduction for acceptance of responsibility, the total offense level would be 26 and the criminal history category would be V.[92] But, as I shall next explain, two other departures are appropriate.

## B. Departure Due to Delayed Prosecution and Resulting Distortion of the Guidelines

By delaying the federal prosecution of this case for a very long time and until after the defendant served his state sentence for robbery of the IHOP restaurant, federal law enforcement authorities (unintentionally) distorted the Guidelines. I no longer have the opportunity to run the federal sentence concurrent with the sentence for the robbery of the IHOP because the defendant has already served that state sentence. As earlier explained, both the IHOP robbery and the federal bank robbery charges resulted from a drug-induced spree over a short period of time. Because that IHOP robbery was part of one short spree that also involved the federal offenses, a fully concurrent sentence would have been appropriate had I not been deprived of the opportunity to impose such a sentence.[93]

Accordingly, and pursuant to U.S.S.G. § 5G1.3(c) and U.S.S.G. § 5K2.0, I am likely to depart downward and reduce the federal sentence by 35 months (the time

---

history, but these two "burglaries" should not be used to catapult him into the category reserved for the worst of the worst (category VI).

[92]2nd PSR ¶¶ 50-56 (multiple count adjustment) & ¶ 123, at 25 & note (explanation). After considering all of the factors in U.S.S.G. § 4A1.3(b), I find and conclude that the defendant should be held accountable for 5 points rather than 9 points for these burglaries. Using this analysis, the defendant's point score would be 12 rather than 16 and his criminal history category would thus be V.

[93]See U.S.S.G. § 5G1.3(c) & n.3.

spent in state custody on the IHOP charge).[94]   The delay of several years in the investigation and prosecution of this federal case (and thus sentencing) was caused by the government concentrating on other things even though it could have easily prosecuted the defendant soon after he committed the federal offenses.[95]   While I do

---

[94]See, e.g., United States v. Martinez-Salazar, 318 F. Supp. 2d 127, 130-131 (S.D.N.Y. 2004) (Lynch, J.) (granting departure; holding that sentencing court is permitted to depart downward from Guideline sentence where the delay in prosecuting a state prisoner for a federal crime is longer than a reasonable period to conduct a diligent investigation and the sentencing court concludes that a concurrent sentence would otherwise be in order; "That is, the Government, by waiting to charge or acquire custody over the defendant until his state sentence is nearly expired, can render the question of concurrent sentences moot, and defeat the Court's power, granted by the guidelines, to decide that question.").

[95]Pursuant to an earlier order, I directed Mr. Norton to investigate the reason for the delay.  He completed that investigation and on July 26, 2005, advised me as follows:

>   Mr. Gochenour was arrested by Omaha Police on June 22, 2001, on traffic charges and a state parole violation warrant.  Subsequently, a crime stoppers tip identified him as the suspect in a string of robberies, the most recent of which was the IHOP robbery.  Prosecution on this robbery was immediately pursued by the Douglas County Attorney's Office in Omaha.  Essentially, there are three reasons for delay of the federal prosecution: 1) the catastrophe of 911 occurred, causing the FBI to shift their primary focus from domestic crime to terrorist activities; 2) shortly after 911, the FBI learned of Mr. Gochenour's 3-5 year sentence to state prison for the IHOP robbery; and 3) the agent originally assigned to the defendant's case, A. J. Greer, was transferred to Miami, causing delay during the transition to the newly assigned agent, Chuck Bohling.  Special Agent Bohling reportedly began working the case in June 2003 and submitted his report to the U.S. Attorney in late 2003/early 2004.  Mr. Gochenour was indicted in April 2004.

Court's Exhibit 1.

not second-guess or fault the government for how it allocated its resources, the Guidelines should not be distorted either.  As a result, the presumptive Guidelines range for imprisonment purposes with this departure, together with the departure for overstatement of criminal history discussed above, would be 75 to 102 months.[96]

In sum, and absent any other departures, this range (75 to 102 months), when considered with the 35 months already served in state custody, provides the appropriate incremental punishment for both the state and federal crimes committed by the defendant over three days in June of 2001.[97]  A higher range would allow the government to unilaterally distort the Guidelines.[98]

---

[96]2nd PSR ¶ 123, at 25 & note.  This range assumes a criminal history category of V.  That calculation holds the defendant responsible for, and assesses three points regarding, the IHOP robbery.

[97]Note also that even with a reduction of 35 months, the IHOP robbery is still counted for criminal history purposes in the Category V designation.  That criminal history in part drives the 75- to 102-month range.

[98]In its brief, the government states that the "United States has previously suggested the Court could give the defendant credit for time served on a state robbery sentence in order to put him into the same shoes he would have been in had the government filed the instant charges at an earlier time. . . .  The United States does not retreat from that position."  Filing 69, at 2.  Despite this concession, the government thinks the credit should be less than the total of 35 months.  Again, I respectfully disagree.  The government deprived me of the opportunity to exercise my discretion pursuant to U.S.S.G. § 5G1.3(c) & n.3.  For example, I note that the defendant received a three-level increase for use of a toy gun.  2nd PSR ¶¶ 28, 36, 44.  Had I been given the opportunity, I would have considered this somewhat artificial inflation of the advisory Guidelines in deciding whether the incremental punishment referred to in the Guidelines would be satisfied by a concurrent sentence.  Because of what the government did, I was deprived of that opportunity.  The government must therefore shoulder the doubt created by its late prosecution and the difficulty caused by trying to determine what might have been had the prosecution been timely.  Knowing what I know now, a fully concurrent sentence would have been appropriate

### C.  U.S.S.G. § 5K2.0 Departure Due to Extraordinary
### Post-Offense Rehabilitation

Although our Court of Appeals has generally been intolerant of such departures, it has recognized that a "departure under section 5K2.0 is proper where a district court finds 'an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission.'"[99] The court has cautioned that "[b]ecause the Commission accounted for ordinary post-offense rehabilitation under section 3E1.1, a defendant's rehabilitation must be exceptional enough to be atypical."[100]  And, regarding the question of uniqueness, I have been warned to "explain any extraordinary or atypical factors justifying departure" or reversal is likely.[101]

On facts much less compelling than those presented here, substantial steps at overcoming drug addiction, while maintaining employment and partially caring for one's child, have been labeled "significant post-offense rehabilitative conduct" by the Eighth Circuit.[102]  Those and other relevant factors are present here.

_____

and I would have imposed such a sentence.

[99]Rogers, 400 F.3d at 641 (reversing departure sentence to probation and holding that defendant did not establish extraordinary or atypical rehabilitation as required to justify downward departure) (quoting 18 U.S.C. § 3553(b) and citing U.S.S.G. § 5K2.0(a)(3)).

[100]Id. at 641-42 (citing § 5K2.0(d)(2) & United States v. DeShon, 183 F.3d 888, 889 (8th Cir. 1999)).

[101]Id. at 642 (citing 18 U.S.C. § 3553(c)(2)).

[102]United States v. Lazenby, 439 F.3d 928, 930, 932-33 (8th Cir. 2006) (in a drug conspiracy case, one defendant's post-offense behavior (caring for her son on weekends, attending meetings of a "Moms Off Meth" support group, passing post-arrest drug tests, and becoming a valued and trusted employee) was characterized by the Court of Appeals as "significant post-offense rehabilitative conduct" that was

To be specific, I am persuaded that Gochenour has engaged in extraordinary and atypical post-offense rehabilitation because of the following eleven factors:

(1)     Gochenour was a law-abiding citizen for his first 27 years, and only descended into a depraved, drug-ridden lifestyle after the tragic nature of his parents' death propelled him into a downward spiral.

(2)     Even the government's lawyer conceded that "it's unusual" for a person to be convicted of a part of a crime spree, serve his time in state prison, appear to have turned his life around as a result of that incarceration, and then be prosecuted for another part of that same spree in federal court *after* having served his state time.[103]

(3)     Gochenour's progress while on work release was characterized as "outstanding" by Nebraska authorities.

(4)     Gochenour has seemingly overcome a 10-year history of nearly all-consuming drug abuse (including two failed inpatient drug treatment attempts) and has maintained sobriety for nearly two and one-half years as shown by periodic drug testing, steady work, and the reports of others who know him well.

---

"relevant in evaluating the § 3553(a) factors"). However, and despite the fact that the defendant's "post-offense rehabilitation [was] dramatic and hopefully permanent," the Court of Appeals thought the extent of the variance (departure) (from 70 months to 12 months) was too much, particularly in light of the co-defendant's much higher sentence. Id. at 933. Accordingly, the court reversed and remanded for resentencing.

[103]Filing 57, at 55 (The Court: "[Counsel], you don't have many circumstances like this one. . . . I've seen this twice. Have you seen it more than that?" Government's Counsel: "No. I'm—and I think it's unusual that that happens.")

(5)     Gochenour has devoted himself to gainful employment and, after rising through the ranks, holds a management position and supervises four employees, and that job earns him $34,000 per year.

(6)     Mr. Haeffner and Mr. Nicholson, who work closely with Gochenour and who have dealt with other convicts, believe that Gochenour has been fully rehabilitated.

(7)     Family and friends, including those who Gochenour victimized in the past, attest to Gochenour's rehabilitation.

(8)     Gochenour has voluntarily contributed to the financial support of his child.

(9)     Gochenour has made significant contributions to charity.

(10)    When confronted with stress in his life, Gochenour has had the mature wisdom to seek counseling.

(11)    For two and one-half years, Gochenour has accomplished the foregoing, all the while knowing that the mythical "Sword of Damocles" (in the form of the federal sentence) hung over his head.

The foregoing notwithstanding, the government is not convinced. I have carefully reviewed the government's brief, the cases cited therein, and the assertion that the defendant's behavior does not amount to extraordinary post-offense rehabilitation. I respectfully disagree. In fact, without intending to be unduly argumentative, I challenge the government to find me an opinion where our Court of Appeals (or any other) has declared that conduct comparable to the eleven factors listed above is merely ordinary as opposed to being extraordinary.

In summary, and to be clear, I fully understand and appreciate that departures for post-offense rehabilitation should be very rare, and must be based on truly extraordinary circumstances. Those circumstances exist here within the meaning of U.S.S.G. § 5K2.0.

Nonetheless, the Court of Appeals has instructed that the extent of any such departure must be explained by reference to the sentencing factors found in 18 U.S.C. § 3553(a).[104]  I address that difficult question next.

### D.  The Extent of the Section 5K2.0 Departure for Extraordinary Post-Offense Rehabilitation as Measured Against the Section 3553(a) Factors

After the departures for overstatement of criminal history and delayed prosecution, but before departure for extraordinary post-offense rehabilitation, the proper Guidelines range for prison purposes stands at 75 to 102 months.  Given Gochenour's extraordinary efforts at post-offense rehabilitation, I find and conclude that a prison sentence of 24 months is the sentence which is most consistent with the advisory Guidelines and all the sentencing factors.  Pursuant to U.S.S.G. § 5K2.0, I

---

[104]Lazenby, 439 F.3d at 932 ("'Sentences varying from the guidelines range . . . are reasonable so long as the judge offers appropriate justification under the factors specified in 18 U.S.C. § 3553(a).'" (citation omitted)).  Insofar as the extent of the divergence is concerned, whether a judge "departs" or "varies" due to post-offense rehabilitation does not appear to matter.  That is, the focus appears to be the same no matter the nomenclature.  In either case ("departure" or "variance"), the relevant question may be stated as follows:  Is the lesser sentence imposed due to atypical post-offense rehabilitation consistent with section 3553(a)?  In answering this question, the degree of the sentence reduction matters a very great deal.  "'How compelling [the] justification must is proportional to the extent of the difference between the advisory range and the sentence imposed.'"  Id. (citation omitted).  In simple words, the bigger the break, the better the justification.

will likely depart downward as a result of that rehabilitation and impose such sentence.

In arriving at this decision, I realize that a 24-month prison sentence is a very big discount. But, I respectfully suggest, and truly believe, that the justification for this break is equally compelling. With reference to the most relevant statutory sentencing factors,[105] I explain next why I have tentatively come to this decision.

*18 U.S.C. § 3553(a)(1)*

This portion of the sentencing statute requires that I examine "the nature and circumstances of the offense and the history and characteristics of the defendant." These bank robberies were among the most innocuous that I have seen. No one was injured or traumatized and very little money was taken. In fact, the robberies were pathetically inept. The bank robberies and the related IHOP restaurant robbery, for which the defendant has served 35 months of state time, all took place over the span of only three days.

As for the history and characteristics of the defendant, I have detailed that information earlier. For this purpose, suffice it to say that Gochenour is a smart man, who was law-abiding until he went very wrong after the death of his parents when he was 27 years of age. Now, at age 39, and after "outstanding" success while on work release, he has seemingly overcome an all-consuming addiction to crack cocaine while becoming a highly productive member of society. He has done this under the unusual pressures of a pending federal indictment.

---

[105]The sentencing factors are found at 18 U.S.C. § 3553(a). I concentrate mainly on 18 U.S.C. § 3553(a)(1), § 3553(a)(2)(A)-(D), § 3553(a)(4), and § 3553 (a)(6), although I have considered all the other factors.

-26-

To summarize, the crimes were comparatively mild, the defendant has partially served his debt to society for the crime spree by spending 35 months in state custody for a portion of that spree, and the defendant, like Lazarus, has apparently been rehabilitated. These factors heavily tip the scale toward leniency.

*18 U.S.C. § 3553(a)(2)(A)-(D)*

This part of the sentencing statute requires an analysis of several issues. I turn to those next.

There is a need for the sentence to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment. In this regard, I agree with the government that some time in prison must be imposed to satisfy these needs. In particular, the concept of "just punishment" requires Gochenour to "pay" for the three bank robberies. "Payment" means going behind the bars for some period of time.

There is also a need for the sentence to afford adequate deterrence and, relatedly, to protect the public from further crimes by the defendant. In this respect, there are two types of deterrence. I must deter the offender and protect the public from him, and I must also try to deter other potential offenders. As the probation officer recognized, "the public does not need protection from Mr. Gochenour" now that he has turned his life around.[106] Thus, the concept of specific deterrence favors leniency.

But, appreciating the centrality of banks in our financial system, we cannot allow other bank robbers to think that inventive arguments may somehow insulate them against prison should they elect to rob financial institutions. Indeed, if there is

---

[106]2nd PSR ¶ 133.

any type of criminality that prison sentences deter, it is bank robbery.  This portion of the statute argues in favor of a stiff prison sentence.

Given the defendant's extraordinary turn-around, there is no need for the sentence to provide the defendant with educational or vocational training, medical care, or other correctional treatment.  (But I agree with the probation officer that if a prison sentence is imposed, the defendant would benefit from the Bureau of Prison's intensive drug treatment program.[107])  This portion of the statute tips toward leniency.

### 18 U.S.C. § 3553(a)(4)

This portion of the sentencing statute requires that I examine the relevant sentencing range provided by the Guidelines.  As noted earlier, that range, before departure for extraordinary rehabilitation, but after departure for overstatement of criminal history and distortion of the Guidelines by delayed prosecution, is 75 to 102 months in prison.  That range is the normal or presumptively correct sentence.  This portion of the statute therefore argues in favor of a sentence of at least 75 months in prison.  It also provides a measuring point for gauging the reasonableness of any lesser sentence.

### 18 U.S.C. § 3553(a)(6)

This part of the sentencing statute requires that I address the "need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."  Here, there is little likelihood of "unwarranted" sentencing disparity should I decide to impose a lenient sentence.

---

[107]2nd PSR ¶ 133.  According to the probation officer, a 24-month prison sentence "will also afford him adequate time to complete the 500 hour RDAP program through the Bureau of Prisons."

After nearly 20 years as a federal judge, with nearly 15 of those years as a federal district judge, I have sentenced more than a thousand people.[108]  I have seen only one case that is similar to this one, and that case is only roughly comparable.[109] Indeed, I have never seen a case where a defendant, with such a horrible criminal history, is prosecuted by state authorities for his involvement in a crime spree, who then, against all odds, rehabilitates himself as a part of serving three years in state prison, and, after that, is prosecuted by the government for the federal portion of the spree.  In short, a sentence substantially below the Guidelines will not result in unwarranted sentencing disparity because defendants who have committed similar crimes are not likely to have a record similar to Gochenour's record.

### Why 24 Months?

Candor requires me to write that picking this sentence teeters on the arbitrary. While perhaps no more than a conclusion, my best explanation is this: A prison sentence of 24 months, on top of 35 months in state prison for a portion of the crime spree, furthers all the reasons we send robbers to prison, while not unnecessarily impeding the defendant's very atypical rehabilitation.[110]  A sentence shorter than 24

---

[108]In 2005, I sentenced 240 people.

[109]United States v. Wehrbein, 61 F. Supp. 2d 958 (D. Neb. 1999) (departing to probation in a drug case, where the government knowingly waited to federally prosecute the defendant until he had served his state sentence for related crimes and where another prison sentence would seriously harm the defendant's disabled child by depriving that child of the irreplaceable assistance of the defendant).

[110]Before I received the second presentence report, I was inclined to think that a 24-month sentence was appropriate.  I did not disclose my thoughts to the probation officer.  Thus, I take comfort in the fact that an experienced probation officer independently arrived at a 24-month sentence as the appropriate disposition.

months is simply too lenient, and a sentence of more than 24 months threatens to erode or even destroy the extraordinary progress that Gochenour has achieved.

### *The Parties' Arguments Regarding the Extent of the Departure*

As might be expected, the parties have radically different views about the extent of any departure for post-offense rehabilitation.  I briefly discuss those views next.

Gochenour's counsel argues, in essence, that it would be a terrible waste to send the defendant to prison now that he has been rehabilitated.  Counsel also implicitly suggests that it would be cruel to do so.  In one sense, it may be both wasteful and cruel to send Gochenour back to prison, but, in another sense, such a sentence is clearly required.  Sentencing is not only about the individual defendant.  There are broader purposes at stake.  Thus, a prison sentence for a rehabilitated man can, and in this case does, serve those broader purposes.  In sum, I agree with the government that the "goal of deterrence will ring hollow if a person who stole a car and robbed three banks is given probation."[111]

While "the United States concedes that the defendant appears to have stayed away from drug and criminal activity which does reflect a change in attitude,"[112] the government also argues that if a departure is given for unusual post-offense rehabilitation, it should only be minimal.  Beyond suggesting that I should not depart at all for post-offense rehabilitation, the government gives me little or no help in determining the proper extent of a departure should I find that such a departure is

---

[111]Filing 69, at 12.

[112]Filing 69, at 10.

warranted. With that lack of help in mind, suffice it to say that I respectfully disagree with the government's minimalist views.[113]

### III.   CONCLUSION

Realizing that the defendant has served 35 months in state prison for a part of his crime spree, and considering that the federal government waited to prosecute him for the remainder of the spree until he got out of state prison, I will likely impose an additional 24 months in prison to account for his federal crimes even though the defendant has been rehabilitated. Before I finally decide, the parties will be given the opportunity to convince me otherwise.

IT IS ORDERED that my tentative findings are that a 24-month prison sentence is appropriate. Oral objections to these tentative findings can be made at the time of sentencing. Unless the parties wish to present new evidence or assert new legal authority, written objections are not required. If written objections are required, such objections shall be submitted by the close of business on Thursday, December 21, 2006. Any written objections shall detail the new evidence or new legal authority that will be relied upon. Written objections shall also estimate the time required to present this new information at the sentencing hearing.

December 11, 2006.                    BY THE COURT:

                                      s/ *Richard G. Kopf*
                                      United States District Judge

---

[113]I wonder why the government does not adopt this "penny-pinching" attitude when frequently recommending a 50 percent or greater departure for cooperation.

-31-